

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 34765-6-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MEGAN CHERISSE LARES-STORMS, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Megan Lares-Storms appeals her convictions for possession of methamphetamine with intent to deliver and for use of drug paraphernalia by challenging the constitutionality of a police dog's sniff of her automobile. We uphold the constitutionality of the sniff and affirm Lares-Storms' convictions.

## FACTS

This appeal concerns purported unlawful drug sales by appellant Megan Lares-Storms. Since Lares-Storms challenges, on appeal, the issuance of a search warrant, most of these facts arise from an affidavit of a law enforcement officer in support of the issuance of the warrant to search the car of Lares-Storms.

In early 2016, the County and City of Walla Walla Law Enforcement Drug Unit received information about Megan Lares-Storms selling methamphetamine. We do not know the origin or specifics of the information. Nevertheless, from past encounters with Lares-Storms, law enforcement officers earlier suspected her to sell narcotics.

The County and City Drug Unit also learned that Megan Lares-Storms drove a 2005 black four door Chevy Malibu with Washington license plate AWN-4415. Again, we do not know the source of the information. Walla Walla Police Department Detective Steve Harris perused Department of Motor Vehicle records and learned that Ines Moreno, not Lares-Storms, was the registered owner of the Malibu. The car's registration listed the vehicle as tan, not black, in color, so Detective Harris checked the vehicle identification number and confirmed the car was not stolen and the license plates had not been switched.

On February 25, 2016, the Walla Walla County and City Drug Unit, led by Detective Steve Harris, attempted a controlled buy, whereby a confidential informant would purchase methamphetamine from a known seller. When the informant met with the seller, the seller explained that he or she did not then possess the methamphetamine and asked the informant to journey to a location near the Border Tavern in west Walla Walla. The seller stated that he or she would rendezvous with his or her supplier at the location and procure methamphetamine to sell to the confidential informant. When law

2

enforcement officers arrived at the Border Tavern area to observe the drug transaction, they eyed a 2005 black Chevy Malibu with plate AWN-4415 occupied only by a female driver. Officers peered as the seller entered the Malibu, promptly exited the car, and delivered methamphetamine to the confidential informant. Officers later showed a picture of Megan Lares-Storms to the informant. The informant could not definitely identify Lares-Storms as the lady pictured in the photograph, but the informant "felt" that the photographed person drove the black Chevy Malibu to the location of the methamphetamine sale. Clerk's Papers (CP) at 36.

More than a month later and on March 30, 2016, Detective Steve Harris saw the black Chevy Malibu with Washington license plate AWN-4415 parked on Chestnut Street near a Walla Walla residence. Detective Harris then confirmed with police dispatch that the Department of Corrections had issued a warrant for Megan Lares-Storms' arrest. Harris spied Lares-Storms, while toting a bag and backpack, exit the residence and enter the Malibu. When Lares-Storms drove away, Harris followed as he called for backup. Lares-Storms later parked at a Taj gas station and food mart. Walla Walla Police Department Officer Nick Henzel responded to the request for assistance. Henzel and Harris situated their cars to block Lares-Storms from driving from the mart's parking lot.

Officer Nick Henzel walked to the driver's side of the Malibu and knocked on the window. Megan Lares-Storms did not respond to the knock, so Officer Henzel

3

opened the car door, grabbed Lares-Storms' arm, and forcibly removed her from the car. While Detective Steve Harris told Lares-Storms that she was under arrest, she dialed the cell phone in her hand. Detective Harris seized the cell phone from Lares-Storms' hand and laid the phone on the driver's seat of the vehicle. Unbeknownst to Harris, Lares-Storms maintained a blue tooth ear piece in her ear. Lares-Storms received a call and told the caller that a police officer arrested her, at which time Harris removed the blue tooth device from her ear and also laid it on the driver's seat of the vehicle.

Megan Lares-Storms expressed concern to Detective Steve Harris about her personal possessions in the Malibu and expressed a desire to lock the car doors. Detective Harris responded that her possessions would remain in the car, which law enforcement would lock. After this exchange, officers transported Lares-Storms to the county jail.

With Lares-Storms removed from the Taj parking lot, Walla Walla Police Detective Steve Harris summoned Officer Gunner Fulmer and his drug sniffing dog Pick to travel to the parking lot so the dog could sniff the Malibu. No officers could smell any odor of methamphetamine outside the car. After Pick's arrival, the dog sauntered around the vehicle. Pick purportedly changed behavior when he smelled a controlled substance. We do not know the nature of the alleged change in behavior. Based on Pick's alerting behavior, Detective Harris directed a towing company to tow

4

the vehicle to a secure storage facility where Harris locked the car and placed evidence tape on the doors and trunk.

On March 31, the next day, Detective Steve Harris applied for a warrant to search the Chevrolet Malibu. Harris signed and submitted an affidavit to support the warrant, which affidavit detailed the facts recited above. The affidavit attached an affidavit from Officer Gunner Fulmer, Pick's handler. In his affidavit, Officer Fulmer detailed his training and experience, including a course from Puget Sound Detection Dogs and his certification in drug detection with two dogs, including Pick, from the Pacific Northwest Detection Dog Association and the Pacific Northwest Canine Association. Fulmer's affidavit also noted that he attended a week's training with the Pacific Northwest Canine Association for drug concealment techniques and street level drug interdiction and a week's training with the same association for drug detection and dog health and first aid.

Officer Gunner Fulmer's affidavit continued with regard to Pick's training and experience and with Fulmer referring to himself in the third person:

> K9 "Pick" has successfully completed a 16 week course of training for the detection of odors emanating from Cocaine, Heroin, and Methamphetamine. This course of training was conducted at Puget Sound Security Detection Dogs, Arlington Washington; under the direction of trainer Christina Bunn. Further, K9 "Pick" and his handler Officer Fulmer successfully completed [indecipherable] 200 hours prior to be[ing] certified by Pacific Northwest Detection Dog Association on January 26, 2015. K9 "Pick" is a 2 year old, female black lab. K9 Pick will recertify every year she is in service.

5

K9 "Pick" is trained to give a "Passive" alert to the presence of odors emanating from controlled substances. This alert is described as a change of behavior, characterized by a tail flag, intensive rapid sniffing and/or focusing on a specific area. This alert phase manifests itself by culminating into a specific alert where K9 "Pick" will passively sit/stand and stare at the source of the odor.

K9 "Pick" and her handler, Officer Fulmer has performed over 400 applications where controlled substances were discovered and / or the odors of controlled substances were present. K9 "Pick" is Officer Fulmer's second service K9, following K9 "Rev" who has since retired from service after 6 1/2 years of serving the Walla Walla Community.

K9 "Pick" and Officer Fulmer are regularly utilized by the Washington State Patrol, Oregon State Patrol, Umatilla County Sheriff, College Place PD, Walla Walla County Sheriff, Washington State Penitentiary, DEA, FBI, and the City of Walla Walla PD for their detection expertise.

CP at 33-34. The affidavit does not indicate whether Pick ever falsely reported the presence of controlled substances or whether he failed to detect the presence of controlled substances.

The Walla Walla District Court granted the search warrant. The warrant authorized law enforcement to enter the Chevy Malibu and seize any illegal narcotics, smoking devices, drug paraphernalia, packaging materials, weighing scales, money from controlled substances sales, written or electronically stored records of drug sales, cell phones, and documents indicating dominion over the Malibu. When officers searched the Chevy Malibu, they snatched a small electronic scale with residue thereon and five plastic sealed bags with suspected methamphetamine in each. Officers' field testing suggested the presence of methamphetamine. The methamphetamine inside the

6

bags weighed thirty grams. Officers discovered other empty plastic bags and $700 in cash.

PROCEDURE

The State of Washington charged Megan Lares-Storms with possession with intent to distribute methamphetamine and use of drug paraphernalia. Lares-Storms moved, under CrR 3.6, to suppress the evidence found inside her car. The trial court denied the motion after ruling that Pick's sniffing of the Malibu did not constitute a search under the Washington Constitution. The parties submitted stipulated facts to the trial court, with Lares-Storms reserving the right to appeal the suppression ruling. The stipulation included facts emanating from the execution of the search warrant. The trial court found Lares-Storms guilty of both charges.

LAW AND ANALYSIS

Megan Lares-Storms appeals the trial court's order denying her motion to suppress evidence seized from the Chevrolet Malibu with a search warrant obtained after a police narcotics dog sniffed the car to determine the presence of drugs. Lares-Storms focuses on whether a dog sniff constitutes a search. Lares-Storms characterizes the canine smell as an unreasonable governmental intrusion into her automobile and its contents. She argues that the dog sniff was an unconstitutional search and, absent the sniff, the remaining facts in the search warrant affidavit do not create probable cause.

The State contends that Officer Gunner Fulmer needed no warrant to direct Pick to

sniff the Malibu. The State characterizes the dog smell as reasonable and nonintrusive. Based on the circumstances of the case, we agree with the State.

Megan Lares-Storms challenges the dog smell only under the state constitution. According to federal law, a dog smell does not constitute a search under the United States Constitution's Fourth Amendment. *Illinois v. Caballes*, 543 U.S. 405, 409, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005); *United States v. Jensen*, 425 F.3d 698, 706 n.2 (9th Cir. 2005).

Washington's Constitution provides: "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." WASH. CONST. art. I, § 7. The unique language of article I, section 7, generally provides greater protection to persons under the Washington Constitution than the Fourth Amendment of the federal constitution provides. *State v. Snapp*, 174 Wn.2d 177, 187, 275 P.3d 289 (2012). The Washington Constitution provides added safeguards, in part, because, unlike the Fourth Amendment, article I, section 7 clearly recognizes an individual's right to privacy with no express limitations. *State v. Ferrier*, 136 Wn.2d 103, 110, 960 P.2d 927 (1998). For example with regard to motor vehicles, the Fourth Amendment acknowledges an "automobile exception" to the warrant requirement, but Washington law recognizes no such exception. *State v. Snapp*, 174 Wn.2d at 192. Sobriety checkpoints pass Fourth Amendment muster, but violate Washington's article I, section 7. *City of Seattle v. Mesiani*, 110 Wn.2d 454, 457-58, 755 P.2d 775 (1988); *Michigan Department of State Police v. Sitz*, 496 U.S. 444,

8

455, 110 S. Ct. 2481, 110 L. Ed. 2d 412 (1990).  Under federal law, law enforcement may search a car incident to arrest if officers hold a reasonable belief that the vehicle contains evidence of the crime of arrest.  *State v. Snapp*, 174 Wn.2d at 190-91.  But, pursuant to Washington law, a warrant must be obtained in such circumstances.  *State v. Snapp*, 174 Wn.2d at 197.  Megan Lares-Storms emphasizes these strong protections afforded one's privacy inside one's motor vehicle.

The State of Washington preliminarily argues that Megan Lares-Storms did not provide a necessary *Gunwall* analysis when arguing that Washington Constitution article I, section 7 provides no greater protection against dog smells than the federal constitution. Washington appellate courts will generally not examine whether the Washington Constitution provides greater protection than the United States Constitution unless a party adequately briefs the *Gunwall* factors.  *Sprague v. Spokane Valley Fire Department*, __ Wn.2d __, 409 P.3d 160, 172 (2018).  Under *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986), we review six nonexclusive neutral criteria to help determine whether the state constitutional clause carries meaning different from its federal counterpart: (1) the textual language of the state constitution, (2) significant differences in the texts of parallel provisions of the federal and state constitutions, (3) state constitutional and common law history, (4) preexisting state law, (5) differences in structure between the federal and state constitutions, and (6) matters of particular state interest or local concern.  *State v. Gunwall*, 106 Wn.2d at 61-62.  Lares-Storms actually addresses two of these factors.

Nevertheless, the Washington Supreme Court previously announced that article I, section 7 bestows greater protection than the Fourth Amendment, such that a *Gunwall* analysis is no longer necessary. *State v. Jackson*, 150 Wn.2d 251, 259, 76 P.3d 217 (2003); *State v. Vrieling*, 144 Wn.2d 489, 495, 28 P.3d 762 (2001).

The State contends that Megan Lares-Storms must still provide the court with a full *Gunwall* analysis because no Washington decision has extended the protections of the state constitution from a dog smell beyond protections afforded by the federal Fourth Amendment. We read *Jackson* and *Vrieling*, however, as not requiring the *Gunwall* analysis no matter the context in which the accused asserts Washington Constitutional article I, section 7 protection.

Searches conducted without prior approval by a judge or magistrate are per se unreasonable under article I, section 7 of the Washington State Constitution, subject only to a few established exceptions. *State v. Duncan*, 146 Wn.2d 166, 171, 43 P.3d 513 (2002). Since Officer Gunner Fulmer garnered no search warrant before Pick's sniff of the Malibu, we must decide whether a dog's inhaling of odors from a car constitutes a search under the state constitution. Since the Washington Constitution does not employ the word "search," the more apt question is whether a dog sniff unreasonably disturbs a citizen's private affairs. *State v. Boland*, 115 Wn.2d 571, 577, 800 P.2d 1112 (1990). Nevertheless, Washington cases still analyze dog smells based on the question of whether the sniff falls within the rubric of a search.

When a law enforcement officer can detect something by using one or more of his or her senses while being lawfully present at a vantage point, the detection does not constitute a search. *State v. Seagull*, 95 Wn.2d 898, 901, 632 P.2d 44 (1981). An officer's surveillance does not constitute a search if the officer observes an object or activity with an unaided eye from a nonintrusive location. *State v. Young*, 123 Wn.2d 173, 182, 867 P.2d 593 (1994). This means of surveillance does not expose a person's private affairs. *State v. Dearman*, 92 Wn. App. 630, 634, 962 P.2d 850 (1998). Nevertheless, a particularly intrusive method of viewing may constitute a search. *State v. Myers*, 117 Wn.2d 332, 345, 815 P.2d 761 (1991).

Any search by K9 Pick did not entail sight. Pick searched by her sense of smell. Officer Gunner Fulmer lacked the acuity of smell to detect controlled substances in the Malibu.

Unlike the United States Supreme Court, Washington courts, when applying Washington law, have not adopted any blanket rule rejecting a dog sniff as constituting a search. *State v. Boyce*, 44 Wn. App. 724, 729, 723 P.2d 28 (1986). Instead, in Washington, whether a dog sniff amounts to a search depends on the privacy rights at stake due to the intrusion. *State v. Boyce*, 44 Wn. App. at 729-30. A person lacks a reasonable expectation of privacy in the air outside of a car window. *State v. Mecham*, 186 Wn.2d 128, 147, 380 P.3d 414 (2016).

11

Megan Lares-Storms contends that Pick's inhalation of methamphetamine molecules unreasonably intruded in her privacy interest in the Malibu. In support of her contention, Lares-Storms cites *State v. Young*, 123 Wn.2d 173 (1994) and *State v. Dearman*, 92 Wn. App. 630 (1998). Nevertheless, both of these cases involve a police investigation into a defendant's home. The privacy implications of a person's home exceed the privacy implications of a person's vehicle. The Washington Constitution grants heightened protection of private dwellings. *State v. Dearman*, 92 Wn. App. at 633 n.5. As a result, *Young* and *Dearman* lack relevance.

We consider *State v. Hartzell*, 156 Wn. App. 918, 237 P.3d 928 (2010) controlling. *Hartzell* addressed whether a dog sniff of a motor vehicle constituted a search. This court held that a dog smelling through an open window of a vehicle from a lawful vantage point does not qualify as a search.

In *State v. Hartzell*, the police linked Charles Hartzell to an apartment shooting where a witness saw someone shoot from the sun roof of a vehicle. Later, when responding to a call reporting a man with a gun, a law enforcement officer waited for backup outside the house. Hartzell arrived in a sports utility vehicle. The officer noticed a bullet hole through the passenger door of the vehicle. A canine officer later arrived with his dog in order to look for the gun that shot the bullet through the passenger side door of the vehicle. The dog jumped on the car and sniffed the passenger door. The dog then wandered down the road and found a semiautomatic handgun one hundred yards distant.

12

On appeal, this court ruled that Charles Hartzell lacked a reasonable expectation of privacy in the air emerging from his vehicle. Hartzell stood outside the vehicle when the dog sniff occurred and the sniff was minimally intrusive. Accordingly, we held the dog sniff did not comprise a search requiring a warrant under article I, section 7 of the Washington Constitution.

Megan Lares-Storms distinguishes *State v. Hartzell* on the facts that Charles Hartzell had an open window and the window to Lares-Storms' Malibu was closed. Lares-Storms cites no decision, however, that makes such a distinction. No decision stands for the proposition that a car with an open window deserves less protection than a fully enclosed car. In both cases, the police dog merely smelled around the car, not inside the car.

We conclude that law enforcement did not unreasonably intrude on Megan Lares-Storms' private affairs by Pick sniffing the air surrounding the Malibu in a business's parking lot. Pick's sniff was less intrusive than the police dog smell in *Hartzell.* We have no facts that Pick jumped on the Malibu to smell air coming from the window. Pick merely sauntered around the car.

Megan Lares-Storms and amicus also challenge the reliability of canine sniffs. Lares-Storms in particular asks us to reject the credibility of Pick's sniff of the Malibu because the affidavit for the search warrant did not identify the accuracy of Pick's sense of smell. The affidavit disclosed that Pick identified controlled substances on four hundred

occasions, but the affidavit does not inform the reader as to how many times Pick mistakenly identified unlawful drugs or failed to detect the presence of drugs. Lares-Storms asks for a rule that demands police officers disclose the false positive rates of police canines in search warrant affidavits.

As part of this challenge, Megan Lares-Storms and amicus afford this court with literature questioning the trustworthiness of dog smells of contraband. According to one legal article, some dogs rarely err and possess a false positive rate of only eight percent, but others dogs react unreliably, with false positive rates reaching over fifty percent, meaning one of every two alerts constitutes a false positive. *See* Lewis R. Katz & Aaron P. Golembiewski, *Curbing the Dog: Extending Protection of the Fourth Amendment to Police Drug Dogs*, 85 NEB. L. REV. 735, 757 (2007). Since warrant applications typically omit the false positive rates of the investigating dog, a reviewing court does not know the range of false alerts that befall the subject police dog.

Lares-Storms observes that dogs alert to compounds inside a controlled substance, which compounds also comprise a lawful substance. For example, dogs do not smell heroin per se, but rather alert to the acetic acid in heroin, which acid is a common ingredient in pickles and glue. Katz & Golembiewski, *supra* at 754-55. Methyl benzoate, the chemical compound to which a dog alerts in cocaine, comprises many lawful products. Katz & Golembiewski, *supra* at 755-56. Evidence also shows that a dog's handler may influence the canine's response.

14

We recognize recent studies and literature that question the reliability of dog sniffs. Nevertheless, we decline to review Megan Lares-Storms' challenge to Pick's credibility. Lares-Storms did not challenge the reliability before the trial court. A party may not generally raise a new argument on appeal that the party did not present to the trial court. *In re Detention of Ambers*, 160 Wn.2d 543, 557 n.6, 158 P.3d 1144 (2007).

Megan Lares-Storms asks us to address her contention despite her failure to raise the argument before the trial court because her contention addresses manifest constitutional error. Assuming any constitutional error, however, any error is not clear or manifest. This court previously held that law enforcement may premise the reliability of a dog's sniff solely on an attestation of the dog's training and certification. *State v. Gross*, 57 Wn. App. 549, 551, 789 P.2d 317 (1990). The court came to this conclusion by citing federal circuit decisions from the 1970s and 1980s. Lares-Storms cites no decision in American jurisdictions contrary to *Gross*. The rejection of the ruling in *State v. Gross* and the formulation of a new rule requiring disclosure of a police dog's record of reliability before the issuance of a search warrant based on a sniff is a subject best left to the trial court after a full exploration of the evidence supporting and opposing the reliability of a sniff or best reserved for our Supreme Court or the state legislature.

No. 34765-6-III
*State v. Lares-Storms*

CONCLUSION

We affirm the trial court's denial of Megan Lares-Storms' motion to suppress evidence seized from the Malibu. We affirm her convictions for possession of a controlled substance with intent to deliver and for use of drug paraphernalia.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Lawrence-Berrey, C.J.

_____
Korsmo, J.

16